[No. B181003. Second Dist., Div. Two. July 27, 2005.]

In re MARINA S., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
STEPHANIE S., Defendant and Appellant

## Counsel

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Kristine P. Miles, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**BOREN, P. J.**—Appellant Stephanie S. appeals from the December 6, 2004, order of the juvenile court terminating parental rights over her daughter, Marina S. (born September 2002). We affirm, as substantial evidence supports the court's finding that the minor was likely to be adopted.

### FACTUAL AND PROCEDURAL SUMMARY

Marina was born with a positive toxicology screen for amphetamines. As a result of appellant's drug use and arrest, the Los Angeles County Department of Children and Family Services (DCFS) took Marina into custody on February 16, 2003, and then placed her with her maternal grandparents. Appellant and Marina had lived with the grandparents until two weeks before the minor was taken into protective custody. Appellant was then homeless and requested that DCFS place Marina in the home of the grandparents.

The DCFS social worker contacted the grandmother, who was interested in having Marina placed with her, and conducted criminal clearances for all adults in the home. The background checks came back clear. The grandparents' home met health and safety standards and appeared appropriate for the child, who had resided there before and was bonded to the family members.

On February 20, 2003, DCFS filed a dependency petition. (Welf. & Inst. Code, § 300, subd. (b).)[1] The petition alleged, in pertinent part, appellant's failure or inability to protect her child since the child was born with a positive toxicology screen for amphetamines, and appellant had a history of substance abuse (amphetamines and methamphetamine) and had failed to complete a drug rehabilitation program, rendering her incapable of providing regular care for the child and endangering the child's physical and emotional health. At the initial detention hearing, the juvenile court found that DCFS had established a prima facie case and detained Marina, who was placed in the custody of her maternal grandparents. Appellant was entitled to monitored visitation.

At the jurisdictional hearing on April 2, 2003, the juvenile court sustained the dependency petition, and ordered DCFS to ensure appellant had visits with Marina at least twice a week and to permit the grandmother to take Marina to appellant's program to visit her. As indicated in the DCFS report before the court, appellant (then 18 years old) admitted using methamphetamines on a weekly basis since she was 14 years old, using drugs around the time Marina was born, and testing "dirty" in her drug rehabilitation program. Appellant had no background of family violence or substance abuse, but she was a chronic runaway and completed high school while finishing her probation term in youth camp.

The DCFS report also indicated that appellant wanted to regain custody of her daughter, but was reluctant to enter a full-time residential program because it would interfere with her newly acquired job. According to the grandmother, appellant's visits with Marina generally went well, though by the end of March appellant had seen her only 10 times in the prior 45 days. Also, on occasion appellant failed to show up for arranged visits, and appellant would sometimes yell at Marina and threatened to put her in a closet if she did not behave.

As indicated in the next DCFS report, the progress report for June 2003, the grandmother informed the social worker that appellant had left her residential drug treatment program because she did not like it and it was too restrictive. Appellant had refused to attend the group sessions, but wanted to enter an outpatient program. Appellant had regular visits at the grandmother's home, but not overnight visits with Marina.

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

At the disposition hearing on June 12, 2003, the juvenile court declared Marina a dependent of the court and ordered DCFS to provide appellant reunification services. The court ordered appellant to attend a drug rehabilitation program with random drug testing, parent education, individual counseling, and counseling to ensure a stable and sober lifestyle. The court also permitted monitored visitations, with DCFS having discretion to change it to unmonitored visits, and authorized the grandmother to arrange monitored visits as often as every day if feasible for her.

After six months of reunification, on October 22, 2003, DCFS reported that Marina remained in her grandmother's home, where she was healthy and happy and developing normally. The child did not exhibit any emotional or mental problems and was alert. The grandmother provided excellent care for Marina and tended to all of her needs, arranging for "well baby" medical exams and monitored visits with appellant.

Appellant had enrolled in a residential drug treatment program, but she was unsuccessful. She also was terminated from an outpatient program due to a relapse and excessive absences, and she provided no proof of enrollment in the requisite parenting program. Appellant blamed her failures on a lack of stable housing. The grandmother did not believe appellant was mature or capable enough to take care of Marina, and the grandparents were "interested in adoption or legal guardianship" of Marina.

At the conclusion of the six-month review hearing, the juvenile court found that reasonable reunification services had been provided and the return of Marina to appellant's care would create a substantial risk of detriment to the child. It terminated reunification services and set a section 366.26 hearing.

At the time of the section 366.26 hearing on February 2, 2004, DCFS reported that Marina was still in the home of her grandparents where she continued to do well. Marina was attached to her grandparents, secure in their care, and progressing age appropriately with no developmental, mental or emotional problems. The grandparents were committed to nurturing and protecting Marina. However, they were at that point reluctant to adopt Marina because they thought that at some point appellant might be mature enough to regain custody of her, and they did not want to remove that possibility from appellant. But the grandparents were interested in becoming Marina's legal guardians.

The DCFS social worker assessed the grandparents' social history, criminal history, child welfare history, motivation for seeking adoption or legal guardianship, relationship with Marina, capacity to meet the child's needs, commitment to a permanent plan for the child, and understanding of legal and financial rights. The grandparents had no prior record with child welfare services and had no criminal record, as indicated by fingerprint searches by the Department of Justice, Bureau of Criminal Identification and Information, as of January 28, 2004. Regarding appellant, she had missed some drug tests and had enrolled in but not completed a sober living program, indicating she was inconsistent in obtaining treatment for her substance abuse problems.

At the February 2, 2004, hearing, the juvenile court appointed the grandparents as Marina's legal guardians. By the August 2, 2004, hearing, however, the grandparents indicated they were "definitely interested in adopting Marina."

Marina, who resided with the grandparents, was progressing well and in what the social worker deemed a safe and nurturing home. Appellant was not consistent in her visitation with Marina, and during an approximately seven-month period she had six negative drug tests and failed to show up for testing on 12 occasions. Appellant failed to comply with her outpatient drug treatment program, kept only two of six appointments in another program, and was terminated from a drug recovery center because she appeared to have little desire to stop using drugs as indicated by her lack of attendance and inconsistency.

DCFS recommended that the juvenile court terminate parental rights and proceed with adoption. On August 2, 2004, the court set the matter for a section 366.26 hearing.

DCFS's report prepared for the section 366.26 hearing on December 6, 2004, indicated that Marina continued to develop normally and was well adjusted. The adoption assessment attached to the report indicated that Marina was physically healthy, personable, played and ate well, and related well to her caregivers. Appellant continued to visit Marina at the home of the grandparents, but visited on an inconsistent basis. And on one occasion the grandmother had to request a restraining order because appellant became violent after appellant's newest child was detained.

The grandparents understood the responsibilities of adoption and were "firm in their desire to adopt Marina." Marina was well adjusted in their home, and they were willing to provide her with a permanent, secure, and safe environment. Appellant did not agree with the recommendation for adoption. The social worker concluded, however, that termination of appellant's parental rights was in the best interests of Marina and recommended that adoption service be offered to the grandparents.

The only impediment to the grandparents' adoption of Marina was that the home study had to be completed. The social worker anticipated the home study would be approved on January 3, 2005. In the meantime, by December 1, 2004, the grandparents had "completed most of the home study paperwork" and were interviewed as a couple by the social worker, with a second visit and individual interviews scheduled for December 6. The grandparents quickly returned most of the home study documents and were "very motivated to adopt Marina and provide her with a permanent and loving home."

At the December 6, 2004, hearing, Marina's attorney would not concur in the recommendation to terminate appellant's parental rights until the home study for the grandparents was completed. The juvenile court, however, stated it did not need a completed home study to terminate parental rights. It noted that since the grandparents were already legal guardians the issue of criminal and child abuse histories probably had already been addressed. The court observed that Marina was very well cared for by the grandparents who wished to adopt her. It found by clear and convincing evidence that Marina was likely to be adopted and terminated parental rights.

## DISCUSSION

■ At a section 366.26 hearing, the juvenile court must select and implement a permanent plan for the dependent child. "Where there is no probability of reunification with a parent, adoption is the preferred permanent plan." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164 [53 Cal.Rptr.2d 93].) "[C]onsideration of the child's best interests is inherent in the legislative procedure for selecting and implementing a permanent plan." (*Id.* at p. 1165; see also *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 427 [96 Cal.Rptr.2d 778].) If a child is likely to be adopted, parental rights must be terminated unless one of several enumerated exceptions applies. (§ 366.26, subd. (c)(1); see *In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1807 [54 Cal.Rptr.2d 560].) Here, appellant does not urge any statutory exception, but rather contends that substantial evidence does not support the juvenile court's finding of adoptability.

■ On appeal, we view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d 217].) An appellate court does not reweigh the evidence. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) Rather, we must determine whether there is substantial evidence from which a reasonable trier of fact could by clear and convincing evidence find a factual basis for the finding as to the child's adoptability. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [29 Cal.Rptr.2d 654].)

■ In the present case, substantial evidence supports the juvenile court's finding that the minor was likely to be adopted. The grandparents, with whom Marina had lived almost her entire life, were committed to adopting her. Indeed, the fact that they were interested in adopting Marina by itself constitutes evidence that she was likely to be adopted. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 [94 Cal.Rptr.2d 693]; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1651 [28 Cal.Rptr.2d 82].) ■ "In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" (*In re Sarah M., supra,* at p. 1650, italics in original.)

Appellant, however, notes that one couple's desire to adopt Marina is merely an inference that others may want to adopt the same child (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 525 [107 Cal.Rptr.2d 280]), and it is not the sole factor in making the finding of adoptability. (*In re David H.* (1995) 33 Cal.App.4th 368, 378 [39 Cal.Rptr.2d 313].) Appellant complains that if the grandparents do not qualify as adoptive parents and Marina continues to live with them, as time passes it would be more difficult to find an adoptive home, and that Marina should be protected from the status of becoming a legal orphan. Specifically, appellant contends that adoptability is "problematic" because there was no adoption home study yet of the grandparents, and there were unspecified issues as to the health of the child and a purported lack of clearance for the grandparents regarding criminal or child abuse histories.

Such fears, however, are completely unfounded. First, the record establishes that Marina had no physical, mental, emotional, or developmental problems whatsoever. She was a happy and healthy child developing appropriately for her age, supporting the conclusion that she was readily adoptable. Second, although the adoptive home study was not completed until later,

DCFS determined through the Department of Justice that the grandparents had no criminal background or child abuse records and the child abuse index database showed no matches.

Third, regarding the lack of a completed home study of the grandparents, we grant respondent's request for judicial notice of an April 29, 2005, court minute order. (See Evid. Code §§ 452, subd. (d), 459.) That minute order reveals, in fact, that approximately three months after the termination order at issue, on March 2, 2005, the home study of the prospective adoptive parents was completed and "approved" by the juvenile court, and that on March 21, 2005, Marina "was adoptively placed." Contrary to appellant's assertion, judicial notice of such a court record does not constitute prohibited postjudgment evidence.

*In re Zeth S.* (2003) 31 Cal.4th 396 [2 Cal.Rptr.3d 683, 73 P.3d 541], relied upon by appellant, held that except in a "rare and compelling case," postjudgment evidence may not be used on appeal as a basis to reopen and reverse a finding supporting the termination of parental rights. (*Id.* at pp. 399, 405, 413–414.) In *In re Zeth S.*, counsel sought to have the appellate court consider postjudgment information from counsel's unsworn statement in a letter brief that the parent was currently interacting with the child and that the relative caretaker had felt pressured by the social services agency to agree to adopt. (*Id.* at pp. 403–404, 407, 414, fn. 11.) However, since the court in *In re Zeth S.* imposed no absolute ban on postjudgment evidence (see also Code Civ. Proc., § 909) and respondent in the present case does not seek to reopen or reverse the termination order, we grant its request for judicial notice of the clerk's minute order—an objective document, the validity and accuracy of which is undisputed.

■ Finally, we note there is no requirement that an adoptive home study be completed before a court can terminate parental rights. The question before the juvenile court was whether the child was likely to be adopted within a reasonable time, not whether any particular adoptive parents were suitable. (See *In re Sarah M., supra,* 22 Cal.App.4th at p. 1651.) "[T]he question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].)

Accordingly, substantial evidence supports the juvenile court's determination to terminate parental rights and free the child to have a permanent home through adoption.

## DISPOSITION

The order under review is affirmed.

Ashmann-Gerst, J., and Suzukawa, J.,[*] concurred.

On August 25, 2005, the opinion was modified to read as printed above.

---

[*]Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.